## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 29 2018, 10:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle D. Gobel
Collier Gobel Homann, LLC
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:
J.A. (Minor Child),

And

S.G.P. (Mother)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 29, 2018

Court of Appeals Case No.
54A01-1709-JT-2268

Appeal from the Montgomery Circuit Court

The Honorable Harry Siamas, Judge

Trial Court Cause No.
54C01-1702-JT-46

**Bradford, Judge.**

# Case Summary

Appellant-Respondent S.G.P. ("Mother") appeals the juvenile court's order terminating her parental rights to J.A. She raises the following restated issue on appeal: whether Appellee-Petitioner the Indiana Department of Child Services ("DCS") presented sufficient evidence to support termination of her parental rights to J.A. Specifically, Mother contends that DCS did not prove by clear and convincing evidence that (1) there is a reasonable probability that the conditions that resulted in J.A.'s removal will not be remedied, and (2) that there is a reasonable probability that continuation of the parent-child relationship between Mother and J.A. poses a threat to J.A.'s well-being. Concluding that the evidence is sufficient to support the termination order, we affirm.

# Facts and Procedural History

Mother is the biological parent of J.A., who was born on March 9, 2015.[1] On November 5, 2015, DCS petitioned to the juvenile court to find J.A. to be a child in need of services ("CHINS"). (App. p. 8). The CHINS petition alleged that the biological father "beat a 9 month old baby that was left in his and [Mother's] care[,]" and that "7 month old [J.A.] was in the home and exposed to a high risk of potential harm because [the Mother] did not stop the abuse."

---

[1] The biological father voluntarily terminated his rights and does not participate in this appeal.

DCS Ex. 4. The CHINS petition further alleged that both parents were arrested as a result of the incident. (Tr. 26-27). J.A. was removed from the home at the time that the CHINS petition was filed. (Tr. 27). DCS also determined that Mother had been working with Healthy Families, a service provider, at the time of the incident. (Ex. 3). She also had a history of alcoholism, depression, and anxiety, but was not seeking treatment at that time. (Ex. 3).

[3] On January 4. 2016, the juvenile court held a factfinding hearing. Mother remained incarcerated at the time of the hearing. On January 11, 2016, the juvenile court entered an order finding that Mother "was charged with neglect of a dependent resulting in serious bodily harm and reckless supervision by a child care provider." DCS Ex. 11. Due to the nature of Mother's pending charges and the fact that she was still incarcerated, the juvenile court determined that J.A. was a CHINS and authorized J.A. to remain placed outside of the home.

[4] On February 2, 2016, the juvenile court entered a dispositional order. Mother was ordered to complete a mental health assessment and follow all recommendations; participate in home-based case services, individual counseling, a domestic violence assessment, and visitation with the Child; and "successfully meet all legal obligations." DCS Ex. 17.

[5] On February 18, 2016, Mother was released after she pled guilty to Level 6 felony neglect of a dependent and was sentenced to two years suspended to probation. (Ex. 28). Approximately one week after Mother's release, there was

a child and family team meeting to discuss the case. (Tr. 74-75). At the meeting, Mother told the Family Case Manager ("FCM") that she had already been "through enough parenting things and she had been through counseling and she felt like that was enough." Tr. Vol. II p. 75. Mother had also been unable to secure consistent housing at that time and was "couch surfing" with friends. Tr. Vol. II p. 77.

[6] During a hearing on April 22, 2016, the juvenile court ordered Mother to complete a mental health assessment and all recommendations, comply with probation, provide stable housing and employment, and participate in medication management. DCS recommended the psychological evaluation because the service providers were concerned about Mother's ability to process and understand what she needed to do to be a productive parent. "It took four or five times for us to kind of explain it to her for her to finally get it and then a week later she couldn't reiterate what she needed to get done." Tr. Vol. II p. 76. Mother also had difficulty focusing on why DCS was involved and what she needed to do to help J.A. (Tr. 7).

[7] During the supervised visits, DCS also reported that Mother would often walk away or get upset and "kind of put her hands over her ears and rock back and forth." Tr. Vol. II p. 115. There were several incidents where Mother became so frustrated that she left the visitation room. (Tr. 44). Mother was also incapable of participating in discussions about finding housing or employment without becoming very frustrated and upset. (Tr. 115).

[8] Mother completed a psychological evaluation in September of 2016. The evaluation recommended that Mother "continue with therapy as least twice a week, and engage in skill building if that was not meeting her needs." App. Vol. II p. 122. The report further stated that Mother "struggles with being able to properly and efficiently maintain [J.A.'s] behavior in longer visits because she has not parented long term." App. Vol. II p. 122. On September 30, 2016, the juvenile court held a hearing. Mother was ordered to continue in services and J.A. remained placed outside of the home. The permanency plan was reunification with a concurrent plan of adoption.

[9] On February 15, 2017, DCS petitioned for the involuntary termination of the parent-child relationship. (App. p. 8-10). On May 4 and August 2, 2017, the court held a factfinding hearing. At the factfinding hearing, a FCM testified that while Mother had made some progress, compliance with services does not "equal growth and engagement." Tr. Vol. II p. 143. The court appointed special advocate testified that termination of Mother's parental rights was in J.A.'s best interest because J.A. needs a safe and stable home. (Tr. 157-58). Based upon all of the evidence presented, the juvenile court issued an order granting DCS's petition for termination of parental rights on August 31, 2017. In doing so, the juvenile court made the following relevant findings:

> 3. On November 3, 2015 the DCS investigated a report of abuse [of] a nine month old baby in the home of Mother and Father. Father was providing childcare for this unrelated baby and he physically abused the child. Mother did not intervene to stop the abuse nor did she alert the authorities. Mother admitted that she knew Father had a violent temper. She heard Father slap the

baby and she saw Father drop the baby apparently because the baby would not stop crying. The infant suffered serious injuries that required hospitalization. [J.A.] was in the home at the time of the abuse to the other child. Father was arrested for battery to the infant and eventually sentenced to prison. Mother was arrested on November 3, 2015. She was in jail for 106 days. On February 18, 2016 she pled guilty to Neglect of a Dependent as a level 6 felony and she was placed on probation for two years.

4. As the result of Mother's arrest, the DCS detained [J.A.] on November 3, 2015. The DCS placed the Child in kinship care with Connie Kouns. [J.A.] has been in this placement since then. [J.A.] was never returned to his parent's care.

5. On November 5, 2015 the DCS filed its petition alleging [J.A.] to be a Child in Need of Services.

6. On January 4, 2016 the CHINS court held a fact finding hearing and adjudicated [J.A.] to be a child in need of services.

7. On February 1, 2016 the CHINS court held a disposition hearing. The court made [J.A.] a ward of the DCS. The court ordered Mother to participate in mental health therapy, domestic violence assessment, home based case management services and supervised visitation with [J.A.]. The court ordered services to Father as well. [J.A.] remained detained outside the home of his parents.

***

9. On September 30, 2016 the CHINS court held a permanency hearing. The court ordered that the services to Mother continue. [J.A.] remained in placement in kinship care. The permanency plan was reunification with a concurrent plan of adoption.

10. On February 15, 2017 the DCS filed its petition for the involuntary termination of the parent-child relationship.

***

12. In the beginning of the CHINS case and for many months during the period of the CHINS case Mother refused to participate in services. The DCS attempted to offer some services to her while she was in jail but she refused to cooperate or accept any services. After her release from jail she still refused to cooperate with the DCS or service providers. Eventually Mother did begin to participate in services. She attended her visitation times with [J.A.] and she was engaged in particular with one service provider. At the time of the fact-finding hearing, she continued to engage in services and she had made some progress.

13. Mother frequently displayed outbursts of anger, frustration and extreme emotion during contacts with the DCS, service providers and while visiting with [J.A.]. During visits Mother demonstrated inappropriate parenting on several occasions. On May 2, 2016 Mother became upset because [J.A.] was crying. She put her hands over her ears and kept screaming "stop, stop, stop". Mother had to leave the room where [J.A.] was in order to calm down. Mother left the room to calm down on other occasions during visitation periods. In November and December of 2016 Mother would become frustrated with [J.A.] when he would not stop crying and she would shake her fists at [J.A.]. In December 2016 [J.A.] was choking and Mother did not know how to clear his throat. During this time period Mother ended some visits early. Mother complained that she did not like being around other people so she did not want to visit with [J.A.] in public places. On one occasion in April 2016 Mother was visiting with [J.A.] at the public library when she became upset because she imagined library patrons were leaving the library because of her. On January 9, 2017 [J.A.] tried to leave the room during a visit; Mother became upset. She said that she did not want to "trap" [J.A.] in the room if he did not want to be around her. Mother tried to block the door with a table. Mother would become upset during family team meetings, cry and cuss when she heard things that upset her. [J.A.] was sometimes present.

14. Mother is seeing a therapist provided by the DCS in order to address Mother's anxiety, inappropriate outbursts, anger and frustration. Mother is impulsive and she has difficulty managing her emotions. Her therapy continued at the time of the fact-finding hearing.

15. Mother has had seven children. One of the children died from fetal alcohol syndrome. Two of her children have been adopted. Two of her children live with their father. Mother has been convicted of sexual misconduct with a minor and failure to register as a sex offender. Mother and Father lived in Colorado beginning in 2007. They were homeless for periods of time and according to Mother they lived in a tent by a river. Father frequently physically and emotionally abused Mother. However, when Mother moved back to Indiana in February 2015 Mother paid for Father to fly back to Indiana with her disability check.

16. Mother did find employment and an apartment in 2016. At the time of the fact-fading hearing she lived with her boyfriend. At the time of the fact-finding hearing Mother was compliant with services but she continued to have emotional outbursts when frustrated. At the July 2017 family team meeting she would not stop screaming when she learned that the DCS was recommending adoption. When she hears things she does not want to hear at the team meetings she lashes out and screams at caseworkers and services providers. She has made suicidal statements as well. Mother has made little progress in her ability to control her emotions, and she has difficulty transferring skills she is being taught in case management and therapy sessions to controlling her emotions, anger and anxiety. There are no additional services that can be offered to her to assist her with this.

18. The kinship care placement will adopt [J.A.] if Mother's parental rights are terminated.

App. Vol. II pp. 12-14.

# Discussion and Decision

[10] This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will consider only the evidence and reasonable inferences that are most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Thus, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* We will only set aside the court judgment terminating a parent-child relationship if it is clearly erroneous. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008).

[11] The traditional right of a parent to establish a home and raise her children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 145 (Ind. 2005). Furthermore, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, parental rights are not absolute and the law allows for the termination of such rights when a parent is unable or unwilling to meet her responsibilities as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans denied.* The purpose of terminating parental rights is to protect the child, not to punish the parent. *Id.* The juvenile court may terminate the parental rights if the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child has suffered from irreversible harm. *Id.*

[12]   Before an involuntary termination of parental rights may occur, DCS is required to prove by clear and convincing evidence that:

> (A) one (1) of the following exists:
>
>> (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
>>
>> (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
>>
>> (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) termination is in the best interests of the child; and
>
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in a termination case is one of "clear and convincing evidence." *In re G.Y.*, 904 N.E.2d 1257, 1260–61 (Ind. 2009).

Here, Mother only challenges two of the juvenile court's legal conclusions regarding the probability of non-remedy and the probability of threat to J.A.'s well-being. She does not challenge the other conclusions or findings of fact, including the conclusion that termination is in J.A.'s best interest. Where the juvenile court's unchallenged findings clearly and convincingly support its ultimate decision to terminate parental rights, we find no error. *T.B. v. Ind. Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*.

# I.  Conditions Resulting in Removal Not Likely to Be Remedied

"We begin by emphasizing that a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006). "When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 2002).

When determining whether there is a reasonable probability that a parent will remedy the conditions resulting in their child's removal from the home, a trial court engages in a two-step inquiry. First the trial court "must ascertain what conditions led to their placement and retention in foster care." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). Second, the trial court must determine "whether there is a reasonable probability that those conditions will not be remedied." *Id*. The statute does not simply focus on the initial reason or reasons for removal, "but also those bases resulting in continued placement outside the home." *In re A.I. v. Vanderburgh Cnty. OFC*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005).

Mother argues that the evidence does not support the finding that there is a reasonable probability that the conditions that resulted in J.A.'s removal will not be remedied. J.A. was initially removed from Mother's care because an unrelated child was injured by J.A.'s father while Mother was present and she did not intervene or seek help for the unrelated child. Mother points to the following in support of her argument: Father was incarcerated and no longer a threat to J.A.; she obtained housing and employment; she was engaged in services; DCS should have approved semi-supervised visits with J.A.; the service providers testified that she had made significant progress in her ability to care for J.A.; and Mother has bonded with J.A.

While it is true that Mother obtained housing and employment, J.A.'s father is incarcerated, and Mother progressed in her services, there is a great deal of evidence that supports the conclusion there is a reasonable probability that the

conditions which led to the continued placement outside of the home will not be remedied. Under Indiana Code section 31-35-2-4(b)(2)(B)(i), DCS must show a "reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied." (emphasis added). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 934 N.E.2d at 806.

[18] The trial court concluded that

> The Child was removed from his parents in November 2015. The DCS has offered reunification services to Mother but she was not able to overcome her parenting deficits. Mother has a long history of inability to care for or raise her children. One child died from fetal alcohol syndrome. Two of her children were adopted. Her other children were raised by their fathers. Mother has a criminal history that involves abuse or neglect of children: sexual misconduct with a minor and neglect of a dependent. Mother failed to protect Child from an abusive Father and she did not protect herself from his abuse. Mother has had long periods of instability in her life including homelessness for periods of time. While she has maintained some stability in employment and housing in recent months and she has been cooperative with services she still has not learned how to control her emotions. Her emotional instability prevents her from providing a safe and nurturing home to Child.

App. Vol. II p. 17.

[19] Mother also argues that she should not be judged for her "difficult past." Appellant's Br. p. 22. Mother, however, misunderstands the law. Under Indiana law, a juvenile court may properly consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, and lack of adequate housing and employment. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." *Id.* In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Based upon the juvenile court's findings and the record, as discussed therein, we conclude that the clear and convincing evidence supports that the juvenile court's determination that there was a reasonable probability that the conditions leading to J.A.'s removal would not be remedied and that the court's conclusion is not clearly erroneous. As for the challenged conclusions, Mother is essentially asking us to reweigh the evidence, which we will not do. *In re N.G.*, 51 N.E.3d 1167, 1170 (Ind. 2016).

## II. Continuation of the Parent-Child Relationship Posed a Threat to the Child's Well-being

[20] Next, we address Mother's claim that DCS failed to show by clear and convincing evidence that the continuation of the parent-child relationship

would be detrimental to J.A. Under Indiana Code section 31-35-2-4(b)(2)(B), DCS need only prove that "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for the placement outside the home of the parents will not be remedied," that "[t]here is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child," *or* that the child has been adjudicated as CHINS on two separate occasions. As discussed above, DCS presented ample evidence for the juvenile court to conclude that there was not a reasonable probability that the reasons for continued placement outside of the parent's home would not be remedied. Because Indiana Code section 31-35-2-4(b)(2(B) is written in the disjunctive, and in light of our conclusion relating to the probability that the conditions leading to continued placement outside of the parent's home would not be remedied, we need not consider Mother's claim that the evidence is insufficient to prove that the parent-child relationship posed a threat to the J.A.'s well-being.

[21] We affirm the judgment of the juvenile court.

Robb, J., and Crone, J., concur.